**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated:  March 30 2015**

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 12-33744 |
| | ) | |
| Daniel B. Grant, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 12-3205 |
| | ) | |
| Construction Data Solutions, LLC, et al., | ) | Hon. Mary Ann Whipple |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Daniel B. Grant, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on Plaintiffs' "Complaint to Determine Dischargeability."  Defendant is the debtor in the underlying Chapter 7 bankruptcy case. Plaintiffs are Construction Data Solutions, LLC, ("Construction Data" or "CDS"), a Florida limited liability company, Data-Maxx Technologies, Inc. ("Data-Maxx Technologies" or "Technologies"), a Florida corporation, and Marjorie J. Brantley, the sole shareholder of Technologies and sole member of CDS.  In their complaint, Plaintiffs allege state law claims of defamation, libel, slander, and invasion of privacy (Count I), tortious interference with business relationships (Count II), intentional infliction of emotional distress (Count III), conversion of property (Count IV), and further allege that the debts resulting from their

state law claims are non-dischargeable under 11 U.S.C. § 523(a)(4) and (a)(6) (Count 5).[1]

The district court has jurisdiction over Defendant's underlying Chapter 7 bankruptcy case and all civil proceedings in it arising under or related to a case under Title 11, including this adversary proceeding. 28 U.S.C. § 1334(a) and (b). The Chapter 7 case and all proceedings in it arising under or related to a case under Title 11, including this adversary proceeding, have been referred to this court for decision. 28 U.S.C. § 157(a) and General Order No. 2012-7 entered by the United States District Court for the Northern District of Ohio. Proceedings to determine the allowance of claims against the bankruptcy estate and to determine the dischargeability of particular debts are core proceedings that this court may hear and determine under 28 U.S.C. § 157(b)(1) and (b)(2)(B) and (b)(2)(I).

This memorandum of decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Defendant is entitled to judgment on the complaint.

## FINDINGS OF FACT

The facts of this case involve the business relationships between Plaintiff Marjorie Brantley ("Brantley") and Defendant and the business entities Plaintiffs Data-Maxx Technologies and Construction Data formed by Brantley and Defendant, respectively. These relationships are complicated by Brantley and Defendant's personal relationship, their use of the business entities and their operating accounts to serve whatever purpose they found useful, and the intermingling of both business and personal finances.

In 2002, Brantley, who lives in Florida, formed Data-Maxx Technologies, a Florida corporation engaged in the development and support of time and attendance software for the construction industry. Defendant owned a flooring company in Ohio and had contacts in the construction industry in Ohio. He expressed an interest not only in using Technologies' software in his company but also acting as a sales representative for Technologies. Brantley installed the software at Defendant's flooring company in late 2007, and Defendant began working for Technologies as a sales representative in Ohio in March 2008.

In August 2008, Defendant closed his flooring company and moved to Florida. A personal relationship with Brantley developed, as well as an ongoing business relationship in Florida. According to

---

[1] Plaintiffs also allege that the debts arising under their state law claims are non-dischargeable under § 523(a)(2)(A). However, at trial, Plaintiffs pursued their dischargeability claims under § 523(a)(4) and (a)(6) only.

2

Brantley, Defendant had ideas for expansion of Technologies' business and offered to loan it money. In September 2008, Defendant loaned Technologies $25,000. [*See* Def. Ex. H]. On October 1, 2008, Technologies repaid Defendant $5,000. [Pl. Ex. 2]. Thereafter, at Defendant's request, attorney John McHugh, his lawyer in Ohio, prepared three promissory notes (collectively, "the Notes") payable to Defendant, one dated September 1, 2008, in the amount $20,000, [Pl. Ex. 1], one dated October 1, 2008, in the amount of $60,000 [Def. Ex. A], and one dated December 1, 2008, in the amount of $20,000 [Def. Ex. B]. Although Brantley testified that she does not remember signing the October 1 and December 1 notes, the court credits McHugh's testimony that all three notes were signed by her as President of Technologies in Florida and in McHugh's presence at the end of the 2008 Thanksgiving holiday. McHugh testified that he did not independently verify that Defendant had in fact loaned those sums but that both Brantley and Defendant told him that $20,000 was loaned in September, that "they weren't certain" as to how much Defendant loaned in October, and that there was to be another $20,000 advanced in December. [Doc. # 76, Trial Tr. at 339].

Brantley, on behalf of Technologies, also executed a Security Agreement on December 2, 2008, in favor of Defendant. [Pl. Ex. 4]. The Security Agreement specifically refers to the Notes and states that "to induce and secure the aforesaid loan . . . and all other liabilities of [Technologies] to Secured Party . . . now existing or hereafter arising, including arising out of the Note or Prior Notes," a security interest is granted in the following assets of Technologies:

> All of [Technologies] accounts now owned or hereafter created or acquired by [Technologies] . . . all guaranties of, security for, and rights to goods, services, or other property related to any of the foregoing; all rights as an unpaid seller of goods and services. . . .; all rights earned under contracts to sell goods or render services; all source code and software used in the business, and all proceeds of any of the foregoing.

[*Id.* at 1]. McHugh testified that the collateral referred to in the Security Agreement was intended to include all of Technologies' intangible assets. Brantley explained that "source code," as referred to therein, is the heart of any software business and is what is used to develop software to be sold. Defendant filed a UCC-1 Financing Statement in the State of Florida on December 3, 2008, covering all of the assets set forth in the Security Agreement. [Pl. Ex. 5].

In November 2008, before the Notes and Security Agreement were executed, a judgment against Technologies in the amount of $18,000 had been entered in the state of Oregon relating to a licensing agreement. Brantley and Defendant were very concerned that additional judgments against the company were on the horizon. Brantley testified that Defendant recommended that a security agreement granting him

3

a $100,000 security interest in Technologies be recorded in order to protect the company against execution of any judgment. Defendant testified that because he was starting to put a lot of money into the company, he requested that the Notes and Security Agreement be executed in order to protect his investment. In any event, Brantley, an experienced business woman, voluntarily executed the documents discussed above.

In late November 2008, Defendant formed Construction Data Solutions, LLC ("CDS"). [Pl. Ex. 7]. He was the sole member of CDS. [*Id.* at 2]. In February 2009, Brantley and Defendant contacted McHugh to discuss certain business concerns. McHugh testified that they discussed a number of management and financial concerns regarding Technologies, including cash flow, liquidity, and accounting issues. The possibility of Brantley filing bankruptcy was also discussed. Although McHugh testified that he was not aware of the fact until later, she did file a Chapter 13 bankruptcy petition in March 2009.

On March 10, 2009, Defendant sent McHugh the following email message:

Assuming we all feel it is best to enforce the security agreement regarding Data-Maxx I will need some kind of documentation regarding Construction Data Solutions (my LLC) to enable the deposit of Data-Maxx checks into that bank account to be able to operate.
. . . .
With the security agreement enforced I hope it will not cause alarm in Jeannie's personal bankruptcy. Her plan is to cease operations of the Data-Maxx sub chapter S and allow for the release of assets to cover the notes and thus allow for continued opportunity in that she would work for CDS.
. . . .
Knowing you're busy as usual any document you could provide showing my rights to the receivables to allow the deposit of Data-Maxx checks in either my personal or LLC account would help until you have time to put the other necessary doc's together. The LLC would be the preferred account . . . .

[Pl. Ex. 46].

After his discussion with Brantley and Defendant in February and after the March 10 email, McHugh prepared three documents, which he testified were prepared simultaneously. [Doc. # 76, Trial Tr., p. 360]. First, he prepared a Notice of Private Sale dated March 10, 2009, which was ultimately signed by Defendant, stating that Technologies was in default under the terms of the Notes and that Defendant had acquired all right, title and interest in the collateral under the Security Agreement and was providing notice of his intent to sell the collateral to CDS for the purchase price of $100,000.00. [Pl. Ex. 6]. Second, he prepared a Bill of Sale dated April 16, 2009, stating that Technologies "does hereby bargain, sell, transfer, assign and convey" to CDS all of its right title and interest in the collateral described in the Security Agreement in satisfaction of "any and all liability due and owing under the various promissory notes to [Defendant]." [Pl. Ex. 8]. The only promissory notes due and owing were the Notes discussed above. The

4

Bill of Sale was signed by Brantley and the original returned to McHugh. Third, McHugh prepared an Assignment of Membership Interest wherein Defendant, as the sole member of CDS, assigned to Brantley his entire interest in CDS "free and clear of all claims and encumbrances." [Doc. # 14]. The Assignment indicates that it was signed by Defendant and accepted by Brantley on July 1, 2009. [*Id.*]. At the time these documents were prepared, Defendant and Brantley had both a personal and business relationship, were living together and, according to McHugh, were in agreement as to what they wanted to accomplish through the documents with respect to third parties. [Doc. # 76 at 323]. Technologies' business operations were conducted out of the parties' home, which also housed the server on which its accounting system and source code were located.

On March 17, 2009, Defendant and Brantley opened an account at Bank of America in the name of CDS, with the account number ending in 9408 ("CDS account"). [Pl. Ex. 9]. Both Defendant and Brantley were signatories on the account and both signed as "member/manager" and indicated that they lived at the same address. [*Id.*]. The account was initially funded with a $7,000 transfer from Technologies' Bank of America account ending in 3314 ("Technologies account"). [*See* Pl. Ex. 12, p. 2; Pl. Ex. 11, p. 3]. On March 10, 2009, Brantley signed a Consent for Use of Similar Name to allow CDS to use the name Data:Maxx in its business, and on March 27, 2009, Defendant filed an Application for Registration of Fictitious Name on behalf of CDS. [Pl. Ex. 10]. In April 2009, Data:Maxx was added as a dba on the CDS account. [*See* Pl. Ex. 13]. Use of the dba Data:Maxx not only allowed for checks made out to Data-Maxx Technologies to be deposited in the CDS account but also allowed for the seamless continuation of Technologies' operations in the eyes of its customers.

The parties disagree as to whether there was delivery to CDS of the assets that were the subject of the Bill of Sale, which included intangible assets such as accounts receivable, contract rights, and all source code and software used in the business. As early as April 2, 2009, checks payable to Technologies on accounts receivable began being deposited in the CDS account, with a total of $49,645.98 deposited in April, $60,399.77 deposited in May, and $19,329.17 deposited in June, 2009. [*See* Pl. Exs. 15 & 16]. Although no formal listing of accounts receivable may have been provided to Defendant, the fact that CDS actually received the proceeds of those accounts convinces the court that they were in fact transferred to CDS.

In support of his position that no transfer of assets to CDS occurred, Defendant underscores the fact that Schedule L of Technologies' federal income tax return for 2009 shows assets consisting of "[b]uildings and other depreciable assets" in the amount of $56,092 to be unchanged from the beginning of the year and

the end of the year and remaining unchanged on its 2010 income tax return. [*See* Exs. 30, p. 4 & 31, p.4]. However, the assets included in that amount include only depreciable assets, not the accounts receivable and other intangible assets transferred pursuant to the Bill of Sale.

Independent contractors that worked for Technologies worked in positions such as software development and support and sales. Although formerly paid from the Technologies account, they began being paid from the CDS account in April 2009. [*See* Pl. Ex. 11, p. 3 & Ex. 12, p.3]. The CDS account became the new operating account for business operations previously undertaken by Technologies, namely, the development and sales of time and attendance software for the construction industry. The court finds this use of the CDS account indicative of a transfer to CDS of Technologies' software and its source code, which, as Brantley explained, is the heart of any software business.

Although the court credits Defendant's testimony that he personally never had access to the source code, the court does not find that determinative as to whether the source code had been transferred to CDS pursuant to the Bill of Sale. The source code was on the server located in the home Defendant and Brantley shared. Those working for CDS, a company owned by Defendant at the time, particularly those working in software development, clearly had access to the source code. There is no evidence that between execution of the April 16, 2009, Bill of Sale and the July 1, 2009, transfer of his interest in CDS to Brantley, that Defendant ever requested, and was denied, access to the source code.

After the Bill of Sale, Brantley credibly testified that the parties wanted Technologies to continue to generate some income since it was designated a women's business enterprise in the state of Florida. She testified that "in case we went after government contracts," she and Defendant wanted to maintain that designation, which apparently requires Technologies to show that it generates some income. To accomplish this, contracts with some of Technologies' older customers who were just paying for annual support of their software were not transferred to CDS. Although the Bill of Sale did not provide for any exceptions to the transfer of Technologies' contract rights, Defendant was complicit in allowing Technologies to retain the contracts that it did.

In arguing that the assets described in the Bill of Sale were never transferred to CDS, Defendant also directs the court to an email that Brantley sent him on November 13, 2010, where she states in part: "I would never try to screw you in the business and what we have agreed on, no matter what happens with our relationship. We own it together as we always agreed, you are owed your investment back, and I will stick by that." [Def. Ex. I]. However, actions speak louder than words. Regardless of any side agreement the parties had, the Bill of Sale was executed, CDS began receiving the accounts receivable payments, and

6

independent contractors working with the relevant software and source code were being paid by CDS. The court finds that these steps taken by Brantley and Defendant demonstrate that assets were in fact transferred and were intended by the parties to be understood by Technologies' creditors as having been transferred.

After Defendant assigned his membership interest in CDS to Brantley on July 1, 2009, she continued to conduct the software business operations through CDS, doing business as Data:Maxx, and continued to use the CDS account for that purpose. Defendant continued working for CDS. Brantley testified that between mid-July 2009 and mid- December 2011, Defendant "was running operations and managing sales." [Doc. # 75, Trial Tr., p. 91-92]. She testified that Defendant was never compensated except for personal expenses that he was permitted to pay using the business account. Likewise, Brantley never took a salary and, instead, also used the CDS account to pay personal expenses. According to Brantley, when personal expenses were paid by either party, they were recorded in a balance sheet account for that person, referred to as an In/Out account, rather than as a business expense. [Doc. # 75, Trial Tr., pp. 222, 249].

By June 2011, Brantley and Defendant's personal relationship had deteriorated and was terminated. Brantley moved out of the house that she had shared with Defendant and that the business paid for as a home office. At that time, Defendant continued working for CDS in sales on an independent contractor basis.

Brantley and Defendant's versions of the disposition of property from the home they shared, which also housed CDS's business assets, differ significantly. Brantley testified that Defendant did not allow her back into the home they had previously shared and only gave her the assets he thought she should have, which, at least initially, did not include the server used by the business. According to Brantley, Defendant improperly converted personal property with a total value of approximately "$18,000 plus." [*See id.* at 187-190]. She lists fourteen items in exhibit 33 consisting of various computer and electronic equipment as well as a Honda Pilot, with a total value of $18,870.87, that she claims were improperly retained by Defendant after she moved out of the home. [Pl. Ex. 33].[2] She lists as a business cost of Defendant's actions "[e]quipment converted by Grant (on breakout already given)" in the lesser amount of $18,683.65. [Pl. Ex. 36]. At trial, when questioned on cross-examination, Brantley testified that the Honda Pilot valued at $6,000, which is included in the items listed in exhibit 33, was actually signed over to Defendant and was not improperly retained by him. She also testified that her $18,000 plus conversion claim includes a patio set valued at $4,000 that Defendant sold and that had been purchased by CDS for the "home office," bar stools valued at $2,000, and a television valued at $1,100, none of which are included in exhibit 33, as well

---

[2] Plaintiffs' exhibit 33 is what purports to be a ledger of Defendant's In/Out account that was prepared by Brantley for trial and that also includes at the end of the ledger property allegedly improperly retained by Defendant.

as various items of computer equipment valued at $6,000 to $10,000. The court finds Brantley's testimony and evidence inconsistent and unpersuasive.

While the court finds credibility issues with both Brantley and Defendant's testimony, it believes, that the parties had, to a large extent, agreed to the division of property and that Defendant was entitled to retain some of the property. The court credits his testimony that several items listed on exhibit 33, namely the desktop computer/monitor, Epson projector, and office computer, are items that he had used in his flooring business in Ohio and had brought to Florida. The court also credits his testimony regarding other items listed on exhibit 33, specifically, that he has never had possession of the Birds Eye trackers or the Sprint overdrive, has looked for and has not found the Motion computer, which was an obsolete, non-working computer, and that he does not have and does not even know what a CTL pad is. With respect to the unspecified computer equipment (two laptops and two monitors) listed on exhibit 33, Defendant testified that a number of laptops and monitors were obsolete and he could not tell to what the listing referred.

The court also credits Defendant's testimony regarding the Apple ipad, television and patio set. He testified that he had purchased the Apple ipad and television. Although the purchases may have been made using funds from the CDS account, it is undisputed that Defendant deposited personal funds into that account and that his compensation included the ability to pay expenses that he incurred from that account. As to the patio set, Defendant testified that, after working for a long time without withdrawing any money and after Data:Maxx had received a check, he and Brantley both "gave ourselves $2,500 or $5,000 to spend on whatever we wanted." [Doc. # 76, p. 451]. With those funds, Brantley purchased an exercise machine and Defendant purchased the patio set. [*Id.*].

With respect to the server used in the business, the record is silent as to when Brantley actually asked to have it removed from Defendant's home after she moved out. According to Defendant, the server was a massive unit and, presumably, was not easily moved. Brantley directs the court to an email exchange with Defendant on August 23, 2011, where he states:

> Until we hear back from McHugh I do not want you thinking you are coming here on a mission to collect anything you feel you deserve . . . you are not authorized to enter the home or garage until we hear back from McHugh. If there is something you desperately need than (sic) I am more than happy to place in the pilot tonight and allow you to take within reason.

[Pl. Ex. 49]. Although Brantley's response to that email did not include a request for the server, Defendant's response to her email included the following:

> As I told you, anything reasonable you can have which certainly would include shipping supplies or even card printers. I have tried to be reasonable. If you want to move servers, and other things like your list (2gopads) then no. I was strongly advised against it.

8

[Pl. Ex. 50]. While this email indicates that the server was still at Defendant's home on August 23, 2011, the court credits Defendant's testimony that Brantley's daughter was eventually given permission to, and did, have it removed from his home. There is no suggestion that Brantley never regained possession of the server. And according to Brantley, neither she nor the business suffered any damages as a result of Defendant's possession before its removal from his home.

Although Defendant had continued working in sales for CDS after the parties' personal relationship ended, Brantley testified that "things went gradually downhill" as a result, at least in part, of Defendant sending her frequent text messages telling her how she should be running the business. Finally, on December 2, 2011, after an argument between Defendant and Brantley via text messages and as she was leaving or preparing to leave on a cruise with her family, she sent him a text message terminating their business relationship and stating that he was no longer associated with the company. Defendant responded with a text message stating: "Hope you are prepared. If only you knew what was coming your way. Enjoy. . . . I will be at IRS office on Monday morning followed by workman's comp, moving to state unemployment from there. That is my Monday, imagine what my Tuesday will look like. Good luck to your future and enjoy your cruise." [Pl. Ex. 34, p. 4]. Defendant sent Plaintiff the following email message early the next morning:

> I hope you have settled down and have rethought what you are doing. No one wins if this is what you want. Mutual destruction will not only hurt the 2 of us but employees as well.
>
> There is no need for this.
> I have not taken any action as it is Saturday AM. I will however if you leave me no choice.

[Pl. Ex. 18]. This email was followed by several emails sent later on December 3 and the morning of December 4, 2011, to a total of 121 addressees, each of which contained the following message ("Email # 1"):

> Due to my concerns about the continued financial stability of Data-Maxx Technologies, and the need to protect my interest as a secured creditor, possibly through litigation, I am writing to let you know that I am no longer engaged or acting on its behalf.

[Pl. Exs. 19-22]. The addressees included business associates, vendors, customers, potential customers with whom Defendant had been working, and some independent contractors of Data:Maxx. Thirty "read" receipts indicating that the email was opened were sent to Defendant's Data-Maxx email.

After learning that Defendant sent Email #1, Brantley sent an email to the addressees acknowledging that Defendant was no longer associated with Data:Maxx and apologizing for their receipt of his email. [Pl.

Ex. 38, Part I, p. 37].  She informed them that Defendant "has no shareholder interest in Data-Maxx Technologies, Inc., nor does he have knowledge of the financial stability of the corporation." [*Id.*].  In addition, she stated that Defendant "represented us in a sales capacity as a subcontract sales agent until the end of this week.  He was not employed as a Data-Maxx employee." [*Id.*].

On December 5 and 6, 2011, Defendant sent three emails from his personal email address to a total of approximately 126 addressees, which again included vendors, customers, potential customers, and independent contractors of Data:Maxx, each of which contained the same message ("Email # 2"). [Pl. Exs. 24-27].  Defendant stated that he was responding with facts to "the preposterous statements" contained in the email sent by Brantley in response to Email # 1.  [*See, e.g.*, Pl. Ex. 24, p. 1].  Defendant's email explained that Brantley runs two companies, Technologies and CDS, and is the sole owner of both.  The email states that there are no employees in either company since she chose "to make everyone an independent contractor for her tax purposes" and that her reference to him as an independent contractor was a misleading statement.  [*Id.*].  The email further states in relevant part:

> Some weeks ago she decided to call me a sales person that is a contract employee, only once I brought up the problem I had with in my opinion was complete insolvency for both companies.  I told her I thought it would be unethical and perhaps fraudulent to take more deposits or new deals under such clear circumstances.  You Judge.  Those are facts.
>
> I am the only secured creditor she has.  As such I have secured position on all assets of the company.  I invested substantial monies into her operation and continued to do such over the 3+ years I was involved in the company.  She cleverly omitted that issue to the email she sent out to customers in response to the one I sent out in an attempt to portray me as a disgruntled employee.  I have intimate knowledge of not only her companies finances but personal finances as well as she often expresses to me that she is broke.  I know most every detail to it all including IRS issues and amounts in both companies and personal.  Then she says I know nothing?  A very fraudulent statement in my opinion.  She has never produced an internal financial statement showing most trade payables, only receivables.  When she posts A/R they are in fact what would be considered Work in Progress or Uncompleted Contracts.  In essense (sic) there are no A/R.  Her support she posts are optional to the customer so I have advised her often that both issues are not a proper procedure under standard accounting principles.  As such, in my opinion, the actual assets of either company is (sic) basically some computers, office equipment and other various things that have little or no value. . . .
> . . . .
> There have been several address changes over the years. . . . The latest checks I received from [Technologies], had on the top left corner 1864 Stevenson Rd. North Fort Myers FL, 33917.  If one were to google earth such you will see a 900 sq. ft 1940 era fishing cottage that is now where some company employees report to and she resides there as well. . . .
> . . . .
> In this case I am simply a creditor that was told I would never be paid and had my email

10

disconnected as Ms Brantley was boarding a cruise ship with her family fully knowing who has not been paid. . . .

My apologies for the length of this email however I felt it necessary so name is not continued to be associated through her dealings and decisions. You are all smart business folks. Do your own homework and decide on your own.

[*Id* at 1-2].

McHugh testified that in early December 2011, there were emails exchanged between Defendant and himself discussing the subject matter contained in Email # 1 and Email # 2. He testified that any email that Defendant submitted to him, he reviewed and revised and that he gave his approval to send to customers a four or five paragraph email that he had reviewed. However, McHugh had no specific recollection of having seen Email # 1 and Email # 2. McHugh also testified that Defendant told him he was a secured creditor and that he proceeded on that basis in reviewing the emails. He further testified that he does not recall seeing an email stating the address of Brantley's personal residence.

In early December, Defendant also made telephone calls to Brian Peal, owner of a company that was founded in 2010 and that provided software development and support services to Data:Maxx/CDS. Peal was one of the maintainers of the source code and a developer of software for Data:Maxx. He had one, sometimes two employees working for him. He testified that his relationship with Data:Maxx had soured around the time that its office was moved into the home shared by Brantley and Defendant as he was not being paid on a timely basis. According to Peal, the purpose of Defendant's telephone call was to garner Peal's support as a creditor in forcing Data:Maxx into bankruptcy. [Pl. Ex. 45, Peal Depo., p. 12]. Peal testified that "it was an extremely hostile conversation on [Defendant's] side towards Data:Maxx. Words were used . . . not the exact words, but the perception of, taking them down, taking them out." [*Id.* at 15]. Peal declined to join forces with Defendant and declined Defendant's request of Peal to provide him with the source code.

On December 16, 2011, Defendant sent Brantley an email and copied it to five others, who Brantley described as "pretty much everyone that worked for Data-Maxx at the time." [Pl. Ex. 40]. The subject of the email was "Notice of Intent to Collect Collateral." In the email, Defendant declared Data:Maxx to be in default of the Promissory Notes and, pursuant to the Security Agreement, demanded that the Collateral, including the source code and required passwords, be made available to him. [*Id.*]. The email stated that use of the collateral after December 16 by Brantley, any employee, or any third party not designated by Defendant is prohibited and that Defendant would seek legal remedies against anyone who continues such use. [*Id.*].

11

In addition to Defendant's phone calls, Peal also received the December 16 email, as well as Email # 1 and Email # 2. He testified that the emails concerned him since Data:Maxx owed his company money and he was at risk, but he continued working for the company until September 2012. However, by then, Data:Maxx was not paying his company's invoices and Peal had decided to close his company. At that time, the one contractor working for him and who he had trained began working as an independent contractor for Data:Maxx. According to Peal, this contractor was competent and the arrangement benefitted Data:Maxx since it would not incur the cost of the mark up in the contractor's pay.

Plaintiffs also offered the deposition testimony of two other independent contractors, Thomas Tomlins and Brian Alm. Both testified that the emails discussed above were received by them and were a cause of concern but that neither took any action as a result thereof and both continue to work for Data:Maxx. [Pl. Ex. 42, Tomlin Depo., pp. 13-15; Pl. Ex. 44, Alm Depo., pp. 11, 14-15]. Alm testified that he reassured several customers who contacted him with questions as to whether Data:Maxx was "going under," and whether support for their software would continue. [Alm Depo. at 16-17]. He further testified that for approximately six months after Defendant's emails were sent out, he received fewer assignments for installation of Data:Maxx software, which he would receive once a salesperson closed a deal. [*Id.* at 17-18]. However, he testified that he has no knowledge of any customer who did not buy a Data:Maxx product because of the emails sent by Defendant. [*Id.* at 26].

Following the emails sent by Defendant, Brantley testified that none of the potential customer leads that he and Data:Maxx's one other salesperson had been working on closed and, as a result, business expected in December 2011 and early 2012 was not realized. Plaintiffs also offer the deposition testimony of Scott Hennells, an accountant who prepared the tax returns for Brantley, Technologies and CDS from at least 2007 through 2012, as well as certain charts prepared by him for trial that purport to summarize sales, gross profit and taxable profit of the business entities for those years. According to Hennells, sales for the combined entities in 2012 were down $193,417 compared to the prior five-year average sales for the companies. The five-year average however is skewed by the fact that the Gulf Oil spill in 2010 resulted in approximately $200,000 additional income that year, which Brantley agrees was an anomaly. Nevertheless, while sales decreased in 2012, the companies' taxable profit, described by Hennells as their bottom line, improved significantly, from $3,037 in 2011 to $36,189 in 2012. [*See* Pl. Ex. 17, pp. 7-8].[3]  Hennells

---

[3]   Two of the three charts prepared by Hennells and admitted into evidence, as well as Plaintiffs' federal income tax returns for 2010 and 2011, show this significant increase in taxable income. [*See* Pl. Ex. 17, pp. 7-8; Pl. Exs. 31 & 32]. The court gives Hennells's chart little or no weight where he has adjusted taxable income by reducing such income by $64,630 for 2010 and increasing taxable income by that amount for 2011 based upon Brantley pointing out to him that certain expenses should be

12

testified that in preparing the charts he relied solely on the relevant income tax returns and numbers provided to him by Brantley. He further testified that he did not determine if fluctuations in sales were the result of any positive or negative effect of Defendant's influence on sales or were due to any other cause.

Brantley testified that Data:Maxx is a "partner" with Sage, a worldwide accounting software company, such that Data:Maxx is shown on Sage's web page as a company whose product interfaces with Sage software. Brantley testified that this "partner" status is a driver of business as Sage has approximately 200 resellers, some of whom Data:Maxx worked with on a regular basis and to whom Defendant sent his emails. According to Brantley, after the emails, those resellers no longer had any leads for Data:Maxx. [Doc. # 75, pp. 152-53].

Data:Maxx was also a partner with Viewpoint, another accounting software company. Brantley testified that she and Defendant had conversations with the owner of Viewpoint in April 2011 about purchasing or investing in Data:Maxx. Some time in 2012, Viewpoint announced its selection of a company other than Data:Maxx to be its main mobile time and attendance vendor.

At the time Defendant sent Emails # 1 and #2, he had been working with over 100 customers and potential customers. [*See* Pl. Ex. 38, Parts I - IV].[4] Defendant had proposed the Data:Maxx system to one potential customer, BOH Brothers, and on November 29, 2011, had provided it with an initial quote of $21,808. [*Id.,* Part I, p. 112]. In an email sent to Brantley the next day, Defendant stated that BOH Brothers were expecting a cost of $100,000 for design and development of their system over the next year. [*Id.* at 110]. He further stated, "I have been told thus far that Data-Maxx is the chosen vendor however that did not come from the company's executives or employees." [*Id.*]. A BOH Brothers representative who had received Email # 1 and # 2 responded to the emails by scheduling separate telephone conferences with Defendant and Brantley. [*Id.* at 120-25]. In the email that he sent to Brantley scheduling the conference, the representative stated, "As you can imagine, it is unsettling and we need to get to the bottom of this and try to get a good handle on Data Maxx's viability as we proceed in our selection process." [*Id.* at 125]. The record is silent as to any discussion that occurred during the telephone conferences. However, the

---

attributed to 2010 rather than 2011. [*See id.* at 12]. There is no indication that such an adjustment was reflected on any amended tax return.

[4] Exhibit 38 consists of four parts, each of which consists of several hundred pages and contains various emails and other documents relating to customers and potential customers with whom Defendant was working and who had received his Email # 1 and/or Email # 2. At trial, the court was directed to dealings with only two of the potential customers, BOH Brothers and Grunley, included in that exhibit. [*See* Doc. # 75, pp. 172-183]. The relevance of most of the exhibit is unclear except perhaps to show that an entity was a customer or that Defendant had been in contact with an entity as a potential customer and that some of the entities included in the exhibit had received his emails.

13

transaction with BOH Brothers never closed.

A representative of Grunley, another potential customer, also received Defendant's emails. In August 2011, an initial quote in the amount of $40,944 for Data:Maxx software and equipment was provided to Grunley by Jeff Fleischer, Data:Maxx's other salesperson. [*Id.*, Part II, p. 58]. On December 7, 2011, after the emails had been sent, Fleischer contacted the Grunley representative asking whether it was possible that he would consider purchasing Data:Maxx's system by the end of the year. [*Id.* at 62]. The Grunley representative responded:

> It's possible, and I was just about to reach out to you with another proposal last week, but I'm a bit concerned about the financial stability and viability of the company following the "Dan Grant rant." His behavior was very odd and unprofessional, and can easily be dismissed as the vengeful and inappropriate conduct of a disgruntled former business associate, but there is some truth amid the rant. For example, he held several important senior titles with the company, including VP of Operations and VP of Business Development.
>
> Also, it was only as a result of his rant that we learned, much to our surprise, that Jeannie Brantley is the president (and apparently, owner) of Data-Maxx. We knew her years ago as a sales representative, and most recently both you and Jeannie represented her to us as the head of the "Technical Programming Team" I find it odd that you simply wouldn't have told us that she is president and owner of the company. . . .
>
> [I]mplementing Data-Maxx is a very important decision for us and I would be remiss if I did not perform due diligence on the company before moving ahead with implementation. It doesn't even matter to me whether Data-Maxx is a "virtual company" that Jeannie runs out of her house, with the entire staff engaged as independent contractors – that's not an unusual business model for a small software company. But before we go any further with our decision, we need some assurances that Data-Maxx has a sufficient revenue stream to remain a viable business concern and has the technical expertise to provide the necessary technical support for its software products for the foreseeable future.

[*Id.* at 61]. The record is silent as to any information provided to Grunley regarding the financial viability of Data:Maxx. However, the Grunley transaction did not close.

Brantley also received responses from a number of other customers, by either email or telephone, expressing concern after receiving Defendant's emails. According to Brantley, some customers were not paying their accounts receivable invoices because of their concerns. [Doc. # 75, p. 183]. Other responses to Defendant and Brantley's emails were simply requests to be removed from the chain of emails. [*See* Pl. Ex. 42, Tomlin Depo. and attached Exs. 4-8]. One response addressed to both Brantley and Defendant from a representative of Kiewit, who had previously chosen a vendor other than Data:Maxx, states, "neither of you have the professional awareness or emotional intelligence to qualify as someone I would want to risk

14

doing business with." [Pl. Ex. 38, Part II, unnumbered p. 204]. Still other responses made clear that Defendant's emails did not affect their relationship with Data:Maxx. [*See id.* at 100 ("you could tell by the tone of his email that he was angry and resorting to disparaging remarks with no truth behind it. . . .no worries from here!!"); Part III, unnumbered p. 35 ("Our company was working with [Defendant] . . . Please have one of your salesmen call me to follow up so that we can continue to move forward."); Part IV, unnumbered p. 202 ("I want to extend our assurances and support to you and Data-Maxx.")]

According to Defendant's unrebutted testimony, by late 2011, Data:Maxx's software was becoming outdated and dysfunctional due to many changes to the source code. He testified that many complaints were being received due to not being able to complete installation of Data:Maxx's software and that Brantley did not want to be introduced as president of the company because she did not want customers complaining to her. That issues with the software existed is supported by a customer letter addressed to Brantley and dated May 21, 2012, terminating its Data-Maxx Software License Agreement because Data-Maxx had been "woefully deficient" in meeting its responsibilities under the agreement "as evidenced by the consistently malfunctioning software provided to Wanzek and Data-Maaxx's unsuccessful attempts to remedy its software deficiencies." [Pl. Ex. 38, Part IV, unnumbered p. 161]. Defendant further testified that new competitors of Data:Maxx were entering the market every year. Brantley acknowledged that there was at least one other significant competitor.

As indicated earlier, Brantley filed a Chapter 13 bankruptcy petition in Florida in March 2009, one month before the effective date of the Bill of Sale and transferring Technologies' assets. The Internal Revenue Service ("IRS") was a creditor paid under her Chapter 13 plan. Brantley testified that she called the Chapter 13 trustee's office in 2012 and told someone at that office of her claims against Defendant. She was told to contact her attorney, which she did and, according to Brantley, he told her that she "did not need to do anything." Her Chapter 13 case was concluded and she received her discharge in January 2014.

## LAW AND ANALYSIS

In their complaint, Plaintiffs seek a monetary award for damages allegedly incurred by them relating to their state law claims against Defendant and a determination that the alleged debts resulting therefrom and from Defendant's alleged embezzlement of funds are non-dischargeable under 11 U.S.C. § 523(a)(4) and (a)(6). A sine qua non of any § 523(a) non-dischargeability claim is the existence of a debt owed by the debtor. *See* 11 U.S.C. § 523(a) (providing that a Chapter 7 discharge does not discharge an individual debtor from "any debt" described in that subsection). Thus, the court first addresses each of Plaintiffs' state law claims in order to determine whether they have proven the existence of a debt owed to any Plaintiff

15

under those claims.

Although as recognized in *In re Dow Corning*, 419 F.3d 543, 548 (6th Cir. 2005), there is a circuit split regarding the use of federal choice-of-law principles versus the forum state's choice-of-law principles when a federal court exercises bankruptcy jurisdiction, both federal common law and Ohio law lead to the Restatement (Second) of Conflicts of Law. *See Med. Mut. of Ohio v. De Sota*, 245 F.3d 561, 570 (6th Cir.2001) (adopting Restatement (Second) of Conflicts of Law under federal common law); *Morgan v. Biro Mfg. Co.*, 15 Ohio St.3d 339, 341-42 (1984) (adopting the Restatement (Second) of Conflicts of Law under Ohio law); *Ohayon v. Safeco Ins. Co. of Ill.*, 91 Ohio St.3d 474, 476 (2001). In tort actions, "the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflict of Laws § 146 (1971). In applying the principles of § 6 to determine the law applicable to an issue, courts are directed to consider four factors: "(a) the place where the injury occurred,(b) the place where the conduct causing the injury occurred,(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and(d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145 (1971).

In this case, Florida clearly has the most significant relationship to Plaintiffs' tort claims. It is where the alleged conduct giving rise to the claimed injuries and the claimed injuries occurred and where the relationship of the parties was centered. It is where Plaintiff Brantley resides and where Defendant resided during the relevant time period. Both Technologies and CDS are Florida entities and Florida was the parties' place of business. The court thus applies Florida law in determining Plaintiffs' state law claims.

**I. Defamation (Libel and Slander)**

To recover in a defamation action under Florida law, a plaintiff must prove that the defendant published a false and defamatory statement, with fault amounting to at least negligence on behalf of defendant, and actual damages. *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). A defamatory publication made by the spoken word is slander and made in written matter is libel. *Gibson v. Maloney*, 231 So. 2d 823, 828 (Fla. 1970). A statement is defamatory if it "tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, . . . exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation." *Rapp*, 997 So. 2d at 1108-09. With respect to the "community" standard in that definition, the Florida Supreme Court explained that the statement need not be construed as defamatory by the community at large but need only

16

be "objectively interpreted" as such by a "substantial and respectable" minority of the relevant community. *Id.* at 1114-15.

The statement argued by Plaintiffs as being defamatory is Defendant's statement that he was a secured creditor of Data:Maxx. There is no dispute that Defendant made such statement multiple times and published it by email. Pursuant to the Bill of Sale and, as found by the court, the delivery of assets referred to therein in full satisfaction of the Notes owed by Technologies to Defendant, stating that he was a secured creditor was false when Defendant made the statements. His security interest in the Collateral was eliminated when the payment obligation under the Notes was satisfied. *See* Fla. Stat. Ann. § 671.201(38) (defining "security interest" to mean "an interest in personal property or fixtures which secures payment or performance of an obligation").

The court also finds that Defendant was at least negligent in stating that he was a secured creditor. The court believes that certain steps were taken and side agreements made before Brantley and Defendant's personal relationship deteriorated, as is suggested by Brantley's November 13, 2010, email to Defendant stating that "[w]e own it together as we always agreed, you are owed your investment back, and I will stick by that," [Def. Ex. I], and that it is more likely than not that Defendant believed that he was still a secured creditor when he stated such in his emails. However, given the clear language in the Bill of Sale and the transfer of the Collateral to CDS, it was incumbent upon him to clarify his legal status as a secured or unsecured creditor.

The court however does not find Defendant's statement that he is a secured creditor to be a defamatory statement. Not every false statement is defamatory. There is no evidence that the recipients of Defendant's emails viewed Plaintiffs any differently simply because Defendant informed them that he was a secured creditor of entities owned by Brantley. Rather, the only evidence regarding reactions to the emails shows that the emails raised a concern regarding the financial stability of Technologies and CDS with at least some customers and potential customers – specifically, whether the companies would be around to provide support and perhaps upgrades for the software sold to them – and with the companies' independent contractors who depended on the continued viability of the companies as a source of income.

The court finds that Defendant's statements that the companies were insolvent and that he had told Brantley that "it would be unethical and perhaps fraudulent to take more deposits or new deals under such clear circumstances" was the cause of their concern, not that Defendant was a secured creditor. An entity is insolvent under the ordinary meaning of the word when it is "unable . . . to pay debts as they fall due in the usual course of business." Webster's Third New International Dictionary 1170 (1986). Independent

17

contractor Brian Peal's testimony that his relationship with the companies began to sour in mid-2011 due to not receiving timely payment and Brantley's 2011 income tax return showing that CDS experienced a net loss of $122,598 at least suggest the truthfulness of Defendant's statement. And Plaintiffs offered no evidence demonstrating otherwise.

For the same reasons, Plaintiffs have also failed to meet their burden of showing that Defendant's statement that he is a secured creditor caused them any damage. While there is some evidence that, as a result of the emails sent by Defendant, Plaintiffs lost opportunity for sales in that they were not given leads by certain resellers of Sage, one of Data:Maxx's partners, the only evidence regarding the reason for the lost sales is a concern regarding the financial stability of the company. There is no evidence that connects any decrease in company sales with the statement that Defendant is a secured creditor. That Brantley did not even consider the statement of concern is indicated by the fact that the email she sent in response to Email #1 does not even address Defendant's secured status or lack thereof.

For the foregoing reasons, Plaintiffs have failed to meet their burden of proving that Defendant owes a debt based on their defamation claim.

## II. Tortious Interference with a Business Relationship

The elements of a claim for tortious interference with a business relationship are "(1) the existence of a business relationship ... (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994). Under Florida law, a tortious interference claim may be based upon interference with business relationships with present or prospective customers where such relationships are "evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Id.* at 815. However, a tortious interference claim "cannot stand where . . .no legally cognizable damage was shown as a result of the alleged wrongdoing." *James Crystal Licenses, LLC v. Infinity Radio Inc.*, 43 Do. 3d 68, 76 (Fla. Dist. Ct. App. 2010). While damages need not be proven with exactitude, "recovery is denied where the fact of damages and the extent of damages cannot be established with a reasonable degree of certainty." *Saewitz v. Saewitz*, 79 So. 3d 831, 833 (Fla. Dist. Ct. App. 2012).

In this case, the first and second elements of Plaintiffs' claim are satisfied in that Defendant was aware of the business relationships between Data:Maxx and those customers, potential customers with whom he had been working, and independent contractors that received his emails. With respect to Data:Maxx's independent contractors, both Alm and Tomkins testified that they took no action after

receiving the emails and continue to work for Data:Maxx. Although Peal eventually closed his business that provided independent contractor services to Data:Maxx, he did so because Data:Maxx was not timely paying for his company's services, an issue that had begun well before Defendant sent his emails. In any event, Peal provided Data:Maxx with the independent contractor he had trained and testified was competent to provide it services when he closed his business. There is no evidence that Data:Maxx suffered any damages as a result of Peal closing his business or of other independent contractors or insiders receiving Defendant's emails.

As to Data:Maxx customers and potential customers, the court finds that Defendant was justified in sending Email #1 to them only to the extent that it informed them that he was no longer associated with Data:Maxx, in light of the fact that he had been working with them as its sales representative. The court finds however that Defendant stating the reason he was no longer acting on behalf of Data:Maxx was due to concerns about its financial stability and the need to protect his interest as a secured creditor, possibly through litigation, was unjustified and done with intent to interfere with those business relationships. Such intent is demonstrated by Defendant's hostility toward Brantley and the entities owned by her during his telephone conversation with Peal after his association with Data:Maxx was terminated where he relayed his intent to "tak[e] them down." [Pl. Ex. 45, Peal Depo., p. 15].

Defendant's Email #2 was sent only in response to Brantley's email that was sent to the same recipients and with the obvious intent of countering her statement that he had no knowledge of the financial stability of the company and that he was merely an independent contractor acting as a sales agent, not an employee. However, the detail and tenor of the email also evinces a further intent to unjustifiably interfere with Data:Maxx's business relationships. For example, after stating his opinion that the entities were insolvent, he states, "I told her I thought it would be unethical and perhaps fraudulent to take more deposits or new deals under such clear circumstances. You Judge. Those are facts." [Pl. Ex. 24, p. 1].

The evidence also shows that Defendant's emails did, in fact, cause interference with Plaintiffs' business relationships. Brantley testified that she received many phone calls and emails from customers and potential customers voicing their concern regarding the financial stability of Data:Maxx after receiving Defendant's emails, including from potential customers BOH Brothers and Grunley, who had both received quotes for installation of a Data:Maxx system. In addition, after the emails were sent, Data:Maxx received no leads from the Sage resellers with whom it had previously regularly worked. Nevertheless, it was incumbent upon Plaintiffs to show that such interference caused them actual damages and to show the extent of any damages. Plaintiffs have not met their burden of proving damages with any reasonable degree of

certainty.

With respect to Data:Maxx no longer receiving leads from certain Sage resellers, the record is silent as to what extent, if any, this impacted sales. For example, Plaintiffs offered no evidence showing what percentage of the leads previously received resulted in sales or what percentage of sales, if any, were the result of leads from those Sage resellers.

Instead, Plaintiffs rely in large part on Hennells' testimony and charts prepared by him for trial. In particular, they rely on his testimony that gross sales in 2012 for CDS and Technologies combined were $193,417 less than the prior five-year average sales for companies. Plaintiffs acknowledge that, after consideration of the $200,000 of additional income in 2010, which was an anomaly resulting from the Gulf Oil spill that year, that 2012 gross sales were down by only $153,417 compared to the previous five-year average. Plaintiffs also offer Alm's testimony that for approximately six months after the emails were sent he received fewer assignments for installation of Data:Maxx software, which he would receive after a salesperson closed a deal. Alm's testimony supports a finding of decreased sales during that six month period.

The reduction in gross sales however is insufficient to directly link Defendant's emails to the decrease in sales. The reduction may have been due to the software becoming outdated or to Defendant's termination and his ability to close a deal. Data:Maxx had cut its sales force in half by terminating Defendant as a sales representative, which fact alone may have resulted in a decrease in sales. Defendant was Data:Maxx's sales representative for numerous customers and potential customers as reflected in Plaintiff's exhibit 38. The record is silent as to how Data:Maxx handled these issues in order to maintain sales at their previous level.

Plaintiffs also rely on evidence regarding deals with potential customers BOH Brothers and Grunley that never closed after they received Defendant's emails. However, there is no reliable evidence that, in all probability, sales to those entities would have closed if Defendant had not interfered. Defendant's statement in his November 30, 2011, email to Brantley that he was told that Data:Maxx is the chosen vendor for BOH Brothers is unpersuasive since his statement is qualified by his explanation that this information did not come from the company's executives or employees and fails to otherwise disclose the source of the information. The court also cannot find that in all probability the Grunley deal would have closed absent Defendant's emails. While Grunley's representative stated concerns regarding Data:Maxx's financial stability and Brantley's lack of forthrightness in identifying her position with Data:Maxx, there is no indication that the deal would have otherwise closed. Rather, the email suggests that negotiations were still

ongoing as Grunley's representative stated only that a purchase was "possible" and that he was going to reach out to Data:Maxx with another proposal when he received the emails. [Pl. Ex. 38, Part II, p. 61]. Absent from the record is any testimony from a representative of any customer or potential customer that the purchase of a Data:Maxx product was not made because of information received in Defendant's emails. On the facts presented, the court cannot find to a reasonable degree of certainty that Data:Maxx's reduced sales were a direct result of Defendant's conduct.

Moreover, even if Plaintiffs had met their burden of showing that the decreased sales were the result of the emails sent by Defendant to customers and potential customers, they failed to quantify any actual damage. Lost profits, not lost sales revenue, is the proper measure of damages. *See Montage Group, Ltd. v. Athle-Tech Computer Sys., Inc.*, 889 So.2d 180, 193 (Fla. Dist. Ct. App. 2004). A determination of lost profits requires the deduction of both costs incurred in generating the revenue and fixed expenses from anticipated sales revenue. *See Del Monte Fresh Produce Co. v. Net Results, Inc.,* 77 So. 3d 667, 673-74 (Fla. Dist. Ct. App. 2011) (computation of lost profits requires deduction from anticipated revenue the costs incurred in performing the services); *Fu Sheng Indus. Co., Ltd. v. T/F Sys., Inc*., 690 So.2d 617, 623 (Fla. Dist. Ct. App. 1997) (lost profit damages must reflect net profits deducting all costs); *State Dept. of Transp. v. Murray*, 670 So.2d 977, 979 (Fla. Dist. Ct. App. 1996) (determination of lost profits must deduct salary paid to owner/supervisor); *Physicians Reference Lab., Inc. v. Daniel Seckinger, M.D. and Assoc., P.A.*, 501 So.2d 107, 109 (Fla. Dist. Ct. App. 1987)(all fixed and variable costs must be deducted from proceeds in determining lost profits). Plaintiffs did not address this issue at trial, and any determination of lost profits by the court would be mere speculation.

For all of the foregoing reasons, Plaintiffs have failed to meet their burden of proving that Defendant owes them a debt for tortious interference with business relationships.

## III. Invasion of Privacy

The Florida Supreme Court adopted the definition of the tort of invasion of privacy set forth in the Restatement (Second) of Torts, *Cape Publications, Inc. v. Hitchner*, 549 So. 2d 1374, 1377 (Fla. 1989), which defines the tort as follows:

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
>
> (a) would be highly offensive to a reasonable person, and
> (b) is not a legitimate concern to the public.

Restatement (Second) of Torts § 652D (1977). This standard is conjunctive and, thus, requires proof of both

the offensive nature and the public concern. *Haley v. Gorell Windows & Doors, LLC (In re Haley)*, 418 B.R. 432, 437 (Bankr. M.D. Fla. 2009).

In this case, Brantley argues that Defendant's disclosure of her home address publicized in Email #2 constitutes an actionable invasion of privacy.[5]  While there may be circumstances where disclosure of an individual's home address maybe actionable, Brantley has shown no such circumstances.  She offered no testimony or other evidence that her address was not otherwise available to the public or as to any steps she may have taken to keep her address private.  "A privacy interest fades when the information involved is already public." *Mudd v. U.S. Army*, 2007 WL 4358262, *5 (M.D. Fla. Dec. 10, 2007) (citing *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494-95 (1975) (recognizing that  the prevailing law of invasion of privacy recognizes that interests in privacy fade when the information involved already appears on the public record)); *United States v. Posner*, 594 F. Supp. 930, 936 (S.D. Fla. 1984)(finding no recovery for invasion of privacy where the information disclosed is in the public domain).

Moreover, the court finds that, absent some special circumstance,  disclosure of an individual's home address would not be highly offensive to a reasonable person.  Brantley testified that disclosure of her home address gave her "some pause" as to her personal security because now Data:Maxx customers could find her if there is a problem that they have. [Doc. # 75, Trial Tr., p. 120].  The court notes that her home address was the same as the business address of Data:Maxx, where presumably customers would turn if there was a problem.  In any event, "[m]inor and moderate annoyance" is insufficient.  Restatement (Second) of Torts § 652D, comment c (1977).  It is only when the publicity given "is such that a reasonable person would feel justified in feeling seriously aggrieved by it, that the cause of action arises."  *Id.*  The facts of this case do not rise to such a level.

## IV.  Intentional Infliction of Emotional Distress

To prevail on an action for intentional infliction of emotional distress, a plaintiff must demonstrate that " 1) the defendant acted recklessly or intentionally; 2) the defendant's conduct was extreme and outrageous; 3) the defendant's conduct caused the plaintiff's emotional distress; and 4) plaintiff's emotional distress was severe." *Johnson v. Thigpen*, 788 So. 2d 410, 412 (Fla. Dist. Ct. App. 2001).  The Florida Supreme Court has relied upon the Restatement (Second) of Torts § 46 in defining extreme and outrageous conduct:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has

---

[5] There is no argument that Plaintiffs CDS and Technologies, as entities, have any actionable privacy rights or claims.

22

been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278-79 (Fla. 1985) (quoting Restatement (Second) of Torts § 46).

Examples of conduct that courts have found to be sufficiently outrageous to support an intentional infliction of emotional distress claim include providing false information concerning a loved one's cause of death that led to the interruption of the loved one's funeral and return of her body for a second autopsy, *Thomas v. Hosp. Bd. of Dir. of Lee Cnty*, 41 So.3d 246, 256 (Fla. Dist. Ct. App. 2010); police officers' conduct encompassing a campaign of extortion leading to the demise of plaintiff's business, given the existence of a relationship of authority that would have led the plaintiff to believe he was subject to arrest for not giving in to the officers' demands, *Gallogly v. Rodriguez*, 970 So.2d 470, 471-73 (Fla. Dist. Ct. App. 2007); and creating a newsletter in which defendants threatened plaintiff and her family with death and serious bodily harm, *Nims v. Harrison*, 768 So.2d 1198, 1200 (Fla. Dist. Ct. App. 2000). *But cf. Legrande v. Emmanuel*, 889 So.2d 991, 995 (Fla. Dist. Ct. App. 2004) (finding that parishioners publicly accusing minister of stealing church funds to buy a new car, while embarrassing and unsettling, did not rise to level of extreme and outrageous conduct).

In this case, Defendant's conduct that Brantley argues supports her claim of intentional infliction of emotional distress consists of sending Email # 1 and # 2 to numerous individuals, his text messages sent to Brantley immediately after she terminated his association with Data:Maxx, and his telephone call to Peal.[6] While inappropriate, unprofessional, and even upsetting, Defendant's conduct was not "so extreme in degree, as to go beyond all possible bounds of decency" and cannot be regarded as "atrocious, and utterly intolerable in a civilized community." As such, Brantley has failed to meet her burden of proving conduct that was sufficiently extreme and outrageous to support a claim of intentional infliction of emotional distress.

---

[6] There is no argument that Plaintiffs CDS and Technologies, as entities, are capable of suffering emotional distress and thus of having claims for intentional infliction of emotional distress.

## V. Conversion of Property

"Conversion is an unauthorized act that deprives another of his or her property, permanently or for an indefinite period of time." *Brand v. Old Republic Nat'l Title Ins. Co.*, 797 So. 2d 643, 646 (Fla. Dist. Ct. App. 2001). "The essence of conversion, however, is not the possession of property by the wrongdoer, but rather such possession in conjunction with a present intent on the part of the wrongdoer to deprive the person entitled to possession of the property." *Id.*

As set forth in the court's findings of fact, Brantley's testimony and evidence regarding property she argues was improperly retained by Defendant is inconsistent and unpersuasive. Several items listed by Brantley as equipment converted by Defendant belonged to him before moving to Florida. Other items were purchased by him. Although they may have been purchased using funds from the CDS account, as noted earlier, it is undisputed that Defendant deposited personal funds into that account and that his sole compensation was his ability to pay expenses that he incurred from the account. Brantley provided the court no reliable basis for distinguishing when Defendant's use of the account constituted his "compensation," when it constituted use of his personal funds, or when it constituted a purchase for the business.

The evidence is also insufficient to find conversion by Defendant of the server used in Data:Maxx's business. In June 2011, Brantley moved out of the home shared with Defendant that housed the server. There is no evidence that Defendant prevented her from taking the server at the time she moved out. Brantley having left it in Defendant's home, his retention of the server cannot be found to be unauthorized before the time that she actually sought to retrieve it. As noted earlier, there is no suggestion that Brantley never regained possession of the server and Brantley testified that Data:Maxx suffered no damages while the server was in Defendant's possession. The record is silent however as to when Data:Maxx regained possession of the server or when Brantley may have asked to retrieve it. The August 23, 2011, email exchange between Defendant and Brantley did not include such a request by her. Defendant's email response to her on that date stating, "[i]f you want to move servers. . . then no" and that he was "strongly advised against" moving the server, without more, is insufficient to conclude that he, in fact, deprived Data:Maxx of possession of its property.

For all of the foregoing reasons, the court finds that Plaintiffs have failed to meet their burden of proving their conversion claims.

## VI. Non-Dischargeability Claims under 11 U.S.C. § 523

In their Complaint, Plaintiffs seek a determination that debts owed to them arising out of their state law claims are non-dischargeable under 11 U.S.C. § 523(a)(6) as debts for willful and malicious injuries.

24

However, as discussed above, Plaintiffs have failed to prove that any debt is owed by Defendant based upon their state law claims. Defendant is thus entitled to judgment on Plaintiffs' non-dischargeability claims brought under § 523(a)(6).

Plaintiffs also allege that Defendant owes them a debt for embezzlement and/or larceny that is non-dischargeable under § 523(a)(4). That section excepts such debts from a debtor's Chapter 7 discharge. Embezzlement and larceny are defined and determined according to federal law. *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 165-66 (Bankr. N.D. Ohio 2003).

For purposes of § 523(a)(4), larceny is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner." *Id.* (citing *Schreibman v. Zanetti-Gierke (In re Zanetti-Gierke),* 212 B.R. 375, 381 (Bankr. D. Kan. 1997)). "Larceny is commonly understood to be synonymous with theft." *Whitmore Lake Pub. Sch. v. CMC Telecom, Inc. (In re CMC Telecom, Inc.)*, 383 B.R. 52, 66 (Bankr. E.D. Mich. 2008).

Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996). A creditor proves embezzlement by establishing that (1) she entrusted her property to the debtor or debtor lawfully obtained the property, (2) the debtor appropriated the property for a use other than that for which it was intended, and (3) the circumstances indicate fraud. *Id.* at 1173. The "fraud" required under § 523(a)(4) is "fraud in fact, involving moral turpitude or intentional wrong, for the purpose of permanently depriving another of his property." *Gen. Motors Acceptance Corp. v. Cline (In re Cline)*, 431 B.R. 307 (Table), *7 (B.A.P. 6th Cir. 2010) (citing *Cash Am. Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 116 (B.A.P. 6th Cir. 2007)). Embezzlement differs from larceny in that the embezzler's initial acquisition of the property is lawful.

At trial, Plaintiffs did not specifically address the evidence they rely upon in support of their embezzlement and larceny claims. To the extent that they rely upon Defendant's retention of certain personal property after Brantley moved out of the house they had shared, for the reasons discussed in connection with their conversion claim, Plaintiffs have failed to meet their burden of proving that Defendant was not entitled to retain such property. As such, Plaintiffs failed to prove that any taking was wrongful or that the property was misappropriated for a use other than that for which it was intended.

The court also finds that Plaintiffs failed to meet their burden of proof to the extent they rely upon Defendant's withdrawals from the CDS account. The only evidence regarding such withdrawals consists of the ledger of Defendant's In/Out account prepared by Brantley for trial that purports to list all of the

personal deposits made to the CDS account by Defendant and his personal expenses paid from that account between July 1, 2009, when his membership interest was transferred to Brantley, and December 1, 2011, after which their business relationship ended. [Pl. Ex. 33]. According to Brantley's calculations, the balance owed to CDS by Defendant on December 1, 2011, not including items allegedly converted by him that are also included at the end of that exhibit, is $15,422.30. However, the court finds this exhibit unreliable and affords it no weight in determining Plaintiffs' claim.

Its unreliability is exhibited by the fact that the $15,422.30 figure that purports to be the amount owed by Defendant is inconsistent with the December 31, 2011, CDS balance sheet, which shows that CDS owed Defendant $23,042.62 in accordance with his In/Out account, [Pl. Ex. 32, unnumbered p.68]. Likewise, balances on exhibit 33 at year end for years 2009 and 2010 showing that Defendant had a positive balance of $80,173.95 and $47,010.51, respectively, are inconsistent with CDS balance sheets for those years, which show that CDS owed Defendant $93,490.10 and $79,269.26 for years 2009 and 2010, respectively. [See Pl. Ex. 30, unnumbered p. 59; Pl. Ex. 31, unnumbered p. 62]. These differences are at least in part the result of Brantley starting with a zero balance on July 1, 2009, based on her mistaken belief that CDS owed Defendant nothing on that date due to the assignment of his membership interest in the company to her free and clear of all claims and encumbrances. While Defendant's membership interest itself was transferred on that date free of all claims, the assignment did not negate claims against CDS, only claims against Defendant's interest in CDS. In addition, the court questions Brantley's ability or incentive to accurately distinguish between all of her own personal expenses that were paid from the CDS account since July 1, 2009, and those of Defendant. And finally, to the extent that Defendant was only compensated by paying his personal expenses from the CDS account as Brantley testified, it is inconsistent to then deduct these expenses from his In/Out account and claim the balance as an amount owed by him to the company. As explained earlier, Brantley provided the court no reliable basis for distinguishing when Defendant's use of the account constituted his "compensation," when it constituted use or withdrawal of his personal funds, or when it constituted a purchase for the business. As such, Plaintiffs failed to meet their burden of proving either larceny or embezzlement with respect to funds in the CDS account.

## CONCLUSION

Plaintiffs' non-dischargeability claims brought under 11 U.S.C. § 523(a)(6) are based upon debts allegedly owed to them by Defendant that arise out of their state law claims of defamation, invasion of privacy, tortious interference with business relationships, intentional infliction of emotional distress, and conversion. Having failed to meet their burden of proving that Defendant owes them any debt arising out

26

of those state law claims, Defendant is entitled to judgment on Plaintiffs' state law claims and § 523(a)(6) claim. And Plaintiffs having failed to meet their burden of proving that Defendant owes them a debt for larceny or embezzlement, Defendant is also entitled to judgment on Plaintiff's claim brought under § 523(a)(4).

  The court will enter a separate judgment in accordance with this Memorandum of Decision.

###